# *Exhibit 2*

# District of Columbia
# Office of the State Superintendent of Education
### Student Hearing Office
### 810 First Street, N.E., Suite 2001
### Washington, DC 20002

| | |
|---|---|
| **STUDENT[1],** <br> **By and through PARENT,** <br><br> *Petitioner,* <br><br><br> **v.** <br><br><br><br> **DISTRICT OF COLUMBIA** <br> **PUBLIC SCHOOLS,** <br><br> *Respondent.* | Case No. 2013-0125 <br><br> Impartial Hearing Officer: <br> Charles M. Carron <br><br><br> Date Issued: <br><br> May 16, 2013 <br><br> Representatives: <br><br> Lisa Seltzer Becker, Esq. and <br> Diana M. Savit, Esq. <br> for Petitioner <br><br> Daniel L. McCall, Esq. <br> for Respondent |

## HEARING OFFICER DETERMINATION

### I. PROCEDURAL BACKGROUND

This is a Due Process Complaint ("DPC") proceeding pursuant to the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. §§1400 *et seq.*

---

[1] Personally identifiable information is attached as Appendix A to this decision and must be removed prior to public distribution.

The DPC was filed March 8, 2013, on behalf of the Student, who resides in the District of Columbia, by Petitioner, the Student's Parents[2], against Respondent, District of Columbia Public Schools ("DCPS").

On March 11, 2013, Frances Raskin was appointed as the Impartial Hearing Officer. On April 19, 2013, Coles Ruff was appointed as the Impartial Hearing Officer *vice* Frances Raskin. Later on April 19, 2013, the undersigned was appointed as the Impartial Hearing Officer *vice* Coles Ruff.

On March 14, 2013, Respondent timely filed its Response, asserting that the DPC was insufficient and stating that Respondent had met all of its obligations under IDEA.

On March 26, 2013, Petitioner filed a Motion for Leave to File Amended Due Process Complaint, which was unopposed.

A Resolution Meeting was held on April 4, 2013, but it failed to resolve the DPC. The statutory 30-day resolution period ended on April 7, 2013. The 45-day timeline for the Hearing Officer Determination ("HOD") started to run on April 8, 2013 and will conclude on May 22, 2013.

Former Hearing Officer Raskin held a Prehearing Conference ("PHC") by telephone on April 9, 2013, at which the parties discussed and clarified the issues and the requested relief. At the PHC, the parties agreed that five-day disclosures would be filed by May 1, 2013, and that the Due Process Hearing ("DPH") would be held on May 8, 2013. At the PHC, Hearing Officer Raskin noted that Respondent's counsel had not filed a notice of insufficiency with her, and that she therefore would not consider it; however, she advised counsel that she found the DPC to be sufficient, and that Petitioner therefore did not need to amend the DPC.

---

[2] The Parents filed the DPC jointly. However, it appears that only Parent A was an active participant in the events giving rise to this proceeding, and only Parent A appeared at the Due Process Hearing. In this Hearing Officer Determination, the term "Petitioner" is used when referring to the Parents, on behalf of the Student. The term "Parent A" is used when referring to actions or testimony of that Parent.

On April 15, 2013, Hearing Officer Raskin issued a Prehearing Conference Summary and Order.

On April 23, 2013, Petitioner withdrew the Motion for Leave to File Amended Due Process Complaint.

On April 24, 2013, Petitioner filed a Motion to Shift Burden of Proof to Respondent. On April 30, 2013, the undersigned denied that Motion. .

On April 30, 2013, the undersigned issued a Supplemental Prehearing Order.

No other motions were filed by either party prior to the DPH, which was held on May 8, 2013, from 9:32 a.m. until 5:07 p.m. at the Student Hearing Office, 810 First Street, NE, Suite 2001, Washington, DC 20002. Petitioner elected for the hearing to be closed.

At the DPH, the following Documentary Exhibits were admitted into evidence without objection:

Petitioner's Exhibits: P-1 through P-26

Respondent's Exhibits: R-2 through R-8

Impartial Hearing Officer's Exhibits: HO-1 through HO-15

Petitioner's objections to Respondent's Proposed Exhibits R-1 and R-8 were sustained on the basis that Respondent failed to comply with provisions of the Prehearing Conference Summary and Order (HO-8) and the Supplemental Prehearing Order (HO-15) regarding resolution of objections to disclosures. Respondent took exception to this ruling, asserting that Impartial Hearing Officers lack the authority to establish requirements related to disclosure of exhibits beyond the requirements in IDEA and its implementing regulations.

Petitioner's objection to Respondent's exhibit R-9 that had been disclosed fewer than five business days prior to the DPH was sustained based upon Petitioner's right to "prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing." 34 C.F.R. § 300.512(a)(3).

3

Respondent took exception to this ruling, asserting, without citation of any authority, that Impartial Hearing Officers have the authority to override 34 C.F.R. § 300.512(a)(3).

The following witnesses testified on behalf of Petitioner at the DPH:

> (a) Parent A;
>
> (b) William R. Stixrud, Ph.D., who was qualified after *voir dire* as an expert in psychological testing of children with disabilities;
>
> (c) Catherine Coppersmith, Associate Center Director, Lindamood-Bell Learning Processes, who testified as a fact witness after being disqualified as an expert witness after *voir dire*; and
>
> (d) William D. Ling, Ph.D., who testified as a fact witness.

The undersigned struck a number of witnesses from Respondent's proposed witness list that was disclosed on May 1, 2013, on the basis that Respondent had failed to comply with the provisions of the Prehearing Conference Summary and Order (HO-8) regarding resolution of objections to disclosures, as well as a provision of the Supplemental Prehearing Order (HO-15) requiring notice via email of any witnesses that would be included in the May 1, 2013 disclosure that had not previously been identified. Respondent took exception to this ruling, asserting that Impartial Hearing Officers lack the authority to establish requirements for disclosure related to witnesses beyond the requirements in IDEA and its implementing regulations.

Respondent determined not to call any of its remaining four proposed witnesses.[3]

At the conclusion of Petitioner's case, Respondent made an oral motion for directed finding. The undersigned took the motion under advisement pending review of

---

[3] Petitioner did not rest her case until 4:00 p.m. Respondent's counsel announced that none of Respondent's witnesses were available that late in the day. Although the DPH had been scheduled to run until 5:00 p.m., the undersigned provided Respondent's counsel the opportunity to continue the DPH to another day by providing notice to that effect by noon on May 10, 2013. Respondent failed to provide such notice, and the undersigned adjourned the hearing as of its conclusion on May 8, 2013.

4

his notes of the witnesses' testimony, legal research, and review of any written arguments to be filed by the parties after the DPH as discussed below. This HOD renders Respondent's oral motion moot.

The parties gave oral closing arguments at the DPH. The undersigned provided the parties the opportunity, if they wished, to file written arguments on two legal issues. The parties filed post-hearing briefs on May 13, 2013. Separately, Respondent submitted a copy of a policy letter issued by the Office of Special Education Programs ("OSEP") of the U.S. Department of Education. Because this policy letter was submitted before the time deadline for written arguments, the undersigned accepted it as a supplement to Respondent's post-hearing brief. The undersigned has disregarded arguments in the post-hearing briefs that went beyond the two legal issues that the undersigned identified on the record at the DPH for which written arguments would be accepted.

## II. JURISDICTION

The DPH was held pursuant to the IDEA, 20 U.S.C. §1415(f); IDEA's implementing regulations, 34 C.F.R. §300.511, and the District of Columbia Code and Code of D.C. Municipal Regulations, *see* DCMR §§ 5-E3029 and E3030. This decision constitutes the Hearing Officer Determination ("HOD") pursuant to 20 U.S.C. § 1415(f), 34 C.F.R. §300.513, and §1003 of the *Special Education Student Hearing Office Due Process Hearing Standard Operating Procedures.*

## III. CIRCUMSTANCES GIVING RISE TO THE DUE PROCESS COMPLAINT

The circumstances giving rise to the DPC are as follows:

The Student is male, Current Age, and does not currently attend school.  The Student has been determined to be eligible for special education and related services as a child with multiple disabilities under the IDEA.  This case arose after Respondent authorized Petitioner to obtain an Independent Educational Evaluation (an "IEE"),

5

specifically a comprehensive psychological evaluation of the Student. Petitioner asserts that no psychologist has been willing to conduct the IEE at the rate authorized by Respondent given the Student's particular history and testing needs. Respondent asserts that the rate is set by District of Columbia law and that, in any event, there are psychologists willing to accept the authorized rate.

### IV. ISSUE

As confirmed at the PHC and in the Prehearing Conference Summary and Order issued by former Hearing Officer Raskin, the following issue was presented for determination at the DPH: whether Respondent denied the Student a free appropriate public education ("FAPE") by providing Petitioner an authorization to obtain an independent psychological assessment at public expense on June 8, 2012, that provided insufficient payment for the assessment to allow Petitioner to find an evaluator willing to conduct the assessment.

### V. RELIEF REQUESTED

Petitioner requests the following relief: an order requiring Respondent to authorize payment of approximately Three Thousand Eight Hundred Dollars ($3,800.00) for an independent psychologist to conduct the Student's comprehensive psychological assessment. Petitioner also seeks attorney's fees and costs, which the undersigned lacks the authority to award.

## VI. FINDINGS OF FACT

Facts Related to Jurisdiction

1. The Student is a male, Current Age. Stipulation of Counsel at the DPH, P-11-1.[4]

2. The Student resides in the District of Columbia. P-13-1.

3. The Student has been determined to be eligible for special education and related services under the IDEA as a child with Multiple Disabilities (Stipulation of Counsel at the DPH, P-13-1), specifically, Other Health Impairment ("OHI") and [Specific] Learning Disability (P-11-1). The Student's OHI classification is based upon his diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"). P-11-1.

Facts Related to the Impact of the Student's Disability and Medication on his Psychological Evaluation

4. During a psychological evaluation in October 2011, the Student's test results were affected by his distractibility, fine motor coordination and visual spatial difficulties. P-13-6. Accordingly, the test results were not representative of his overall intellectual functioning. *Id.*

5. The Student now requires, and takes, a large dose of medication for his ADHD, in the morning, along with three other medications to address the side effects of the ADHD medication. Testimony of Parent A.

6. The Student's ADHD medication wears off around noon and he has been found not to benefit from additional doses that day. *Id.*

---

[4] When citing exhibits, the third range represents the page number within the referenced exhibit, in this instance, page 1.

7. When the Student's ADHD medication wears off he is unable to pay attention to academics or testing. *Id.*

8. According to Parent A, the Student is capable of being tested only 40 minutes per day, and only in the morning, so seven to ten sessions would be required for the psychological evaluation to be completed. *Id.*, P-17-1, R-3-2.

9. Dr. Stixrud, who evaluated the Student twice in 2008, testified that on the first day of testing the Student was physically restless and very anxious and had a short attention span. Testimony of William Stixrud.

10. Dr. Stixrud testified that the Student was tested in "shorter segments" but he did not recall how short. *Id.*

11. In 2012, after speaking with Parent A twice, Dr. Stixrud determined that he could test the Student in "one and a half hour segments,"[5] "we'd get him in and see how long he would last," "play it by ear." *Id.*

12. Dr. Stixrud does not know anything about the Student's needs regarding medication except what Parent A has told him. *Id.*

13. As of July 24, 2012, the Student's Individualized Education Program ("IEP") Team concluded that the Student "has difficulty with focus and attention and can reliably be expected to attend to a non-preferred activity for approximately 15-20 minutes, although his attention span is longer when he is more engaged. Due to multiple health problems, [the Student]'s medications can be administered only once daily, in the morning, and their effects have been reported to wear off about noon. His inattentiveness, inability to focus and disruptive behaviors increase after that time." P-13-12.

---

[5] Dr. Stixrud did not specify whether there could be more than one such testing segment in a day.

14. According to Judith Edgehill, Speech Pathologist, the Student requires "quite a few breaks" during testing. P-12-4.

15. According to the Student's tutor, Judith Ross, the Student can focus for 15 minutes at a time on math or 20 to 30 minutes reading aloud. P-12-71, P-24-8.

16. Catherine Coppersmith, Associate Center Director, Lindamood-Bell Learning Processes, supervised the delivery of 180 hours of educational services to the Student, all between 9:00 a.m. and noon. Testimony of Catherine Coppersmith.

17. Ms. Coppersmith conducted one evaluation of the Student and viewed reports on at least seven other evaluations of the Student at Lindamood-Bell, making recommendations on the last three evaluations. *Id.*

18. According to Ms. Coppersmith, the Student was administered academic tests in two-hour sessions over two days with breaks every few minutes. *Id.*

19. Lindamood-Bell did not conduct psychological tests on the Student. *Id.*

20. No witness other than Parent A testified that the Student could only be tested for 40 minutes per day.

21. No witness testified that psychological testing requires sessions without breaks.

22. Based upon all of the record evidence, and taking into consideration the Parent's lack of medical expertise and her lack of emotional distance from the Student (*see,* Section VIII *infra*), the undersigned finds that the Student is capable of being tested for a psychological evaluation for approximately two hours per day, in the morning, with reasonable breaks.

9

Facts Related to the Student's 2012 Psychological Evaluation Review and Petitioner's
Subsequent IEE Request

23. On May 9, 2012, Tina S. Nguyen, Ph.D., School Psychologist, completed a
psychological evaluation review of the Student. P-11-1.

24. On May 17, 2012, Petitioner's counsel wrote to Respondent's compliance
case manager Isaiah Johnson, stating that Petitioner disagreed with Dr. Nguyen's review
and that Petitioner requested, *inter alia*, an independent psychological evaluation at
public expense. P-15-1. Petitioner did not request a neuropsychological evaluation. *Id.*

25. At the Student's IEP Team meeting on June 8, 2012, Petitioner requested an
IEE (Stipulation of Counsel at the DPH) and Respondent agreed to provide Petitioner an
IEE authorization letter for a psychological evaluation (P-12-54 and -104).

26. On June 12, 2012, Petitioner's counsel wrote to Mr. Johnson requesting
issuance of an IEE authorization letter for an "independent psychological" evaluation, not
a neuropsychological evaluation. P-15-5.

27. Based upon all of the record evidence, the undersigned finds that Petitioner
did not request authorization for a neuropsychological evaluation, in writing or orally,
directly or through counsel.

28. Mr. Johnson issued an IEE authorization letter the same day as Petitioner's
counsel's written request, *i.e.*, June 12, 2012. Stipulation of Counsel at the DPH, P-16-1
and -2. The "Assessment Type" authorized was "Comprehensive psychological
evaluation (to include, cognitive, educational, clinical and social history)," not a
neuropsychological evaluation. P-16-1. The maximum amount authorized was one
thousand two hundred ninety-three dollars and fifty cents ($1293.50). *Id.* The letter also
stated that "[r]easonable and documented fees that exceed these rates may be allowed on

10

a case by case basis at the discretion of the District of Columbia, when the evaluator you select can justify that the excess costs were essential for educational and/or diagnostic purposes." P-16-2.

29. There is no evidence in the record that Respondent authorized an IEE for a neuropsychological evaluation.

30. Dr. Ling, who has conducted 2,500 to 3,000 IEEs, including 30 to 40 funded by Respondent, has always accepted Respondent's fee schedule rates and conducted the evaluation that was authorized—psychological evaluation, neuropsychological evaluation, or psycho-educational evaluation—including all the required testing for that evaluation.  Testimony of William Ling.

31. Dr. Ling rarely has encountered a child that he could not evaluate.[6] *Id.*

32. If Dr. Ling, in conducting an evaluation, determines that additional testing or evaluation is needed for the student, Dr. Ling makes that recommendation but he does not contact the "jurisdiction" (*i.e.,* local educational agency) that has funded the evaluation to request funding for additional work because he considers that an advocacy function more appropriate for the parent. *Id.*

33. The fee that Respondent initially authorized for the comprehensive psychological evaluation of the Student—one thousand two hundred ninety-three dollars

---

[6] Dr. Ling gave an example of a boy with severe autism that he evaluated in Massachusetts, whose disability was so severe that Dr. Ling was only able to complete enough testing to provide general results rather than a full evaluation. In her closing argument, Petitioner's counsel attempted to discredit Dr. Ling's testimony by stating that Dr. Ling assumed the Student in the instant case has autism, like the boy in Massachusetts. That is not an accurate characterization of Dr. Ling's testimony.

and fifty cents ($1,293.50)—is "fairly or reasonably consistent" with the fees paid by other "jurisdictions," including several counties adjacent to the District of Columbia. *Id.*

34. Petitioner contacted two of the three evaluators on the list provided by Respondent of evaluators who had agreed to accept the authorized fee.[7] Testimony of Parent A.

35. Parent A did not contact the third evaluator on the list provided by Respondent due to the distance and related travel time between Parent A's residence and the evaluator's office. *Id.*

36. Parent A also contacted potential evaluators not on Respondent's list. *Id.*

37. When Parent A contacted potential evaluators she advised them, *inter alia*, (a) that the Student could only be tested for 40 minutes on any day, and only in the morning; (b) that the Student was "complex;" (c) that the IEE authorization letter required numerous tests; and (d) that there was a large volume of documentation, in the form of previous specialists' reports and evaluations, that the evaluator would be required to review. *Id.*

38. The undersigned finds that Parent A misread the IEE authorization letter in that the letter only required a "comprehensive psychological evaluation." The parenthetical "(to include, cognitive, educational, clinical and social history)" only explained what is included in a "comprehensive" psychological evaluation.

39. All of the evaluators either declined to conduct the evaluation or advised Parent A that they would require a higher fee to conduct the evaluation. Testimony of Parent A.

_____

[7] That list did not include Dr. Ling. Testimony of Parent A.

40. Several evaluators advised Parent A that based upon her description of the Student and his testing needs, they could not agree to perform the evaluation without first meeting or observing the Student, and that they were only willing to take those steps if they would be compensated for doing so even if they did not then evaluate the Student. *Id.*

41. For more than three months after receiving the IEE authorization, Petitioner did not communicate in writing with Respondent about any difficulty obtaining an evaluator or to ask for names of additional evaluators. *Id.*

42. When Parent A called Dr. Stixrud, she asked whether he could do a reevaluation of the Student. Testimony of William Stixrud.

43. Dr. Stixrud interpreted this to be a request for a neuropsychological evaluation that he normally conducts. *Id.*

44. There is no common understanding of what tests are included in a "psychological evaluation," "comprehensive psychological evaluation" or "neuropsychological evaluation."[8] *Id.*, testimony of William Ling, P-4, P-16, R-5, R-6.

45. Despite the differing interpretations of the terms described in the preceding paragraph, there is consensus (a) that a neuropsychological evaluation is more thorough than a psychological or comprehensive psychological evaluation and (b) that a neuropsychological evaluation always includes testing that the other evaluations do not require. Testimony of William Stixrud, testimony of William Ling.

---

[8] Respondent would be well advised to update and conform these various definitions and descriptions of evaluations and the testing required for each; however, the undersigned lacks the authority to order such actions by Respondent.

13

46. Some of the tests specified by the District of Columbia Office of the State Superintendent of Education ("OSSE") in its fee schedule chart (R-6-1) no longer are administered, and others are not normed for children and therefore are inappropriate for IEEs. Testimony of William Stixrud, testimony of William Ling.

47. The psychologists at Stixrud & Associates, whether they are neuropsychologists or clinical psychologists, do "virtually identical" testing. Testimony of William Stixrud.

48. Dr. Stixrud charges two hundred seventy-five dollars ($275.00) per hour for fourteen hours, for a total of three thousand eight hundred and fifty dollars ($3,850.00) to conduct what he refers to as a "standard evaluation" and he would absorb any additional time required to test the Student. *Id.*

49. Dr. Stixrud's office, Stixrud & Associates, rather than Dr. Stixrud himself, quoted the fee of three thousand eight hundred and fifty dollars ($3,850.00) to Petitioner. *Id.,* P-17.

50. Based upon all of the record evidence, the undersigned finds that Stixrud & Associates required three thousand eight hundred and fifty dollars ($3,850.00) for Dr. Stixrud to evaluate the Student because (a) that is what he routinely charges for an evaluation and (b) whenever he conducts a psychological evaluation, he does additional neuropsychological testing and interpretation, and reporting, effectively rendering the evaluation a neuropsychological evaluation.

51. Based upon all of the record evidence, the undersigned finds that Stixrud & Associates' fee requirement was not influenced by any anticipated difficulty testing the Student.

52. On September 24, 2012, Parent A emailed Mr. Johnson requesting an increase in the funded amount, stating that the providers on Respondent's approved vendor list, and some other providers, were either unable to perform the evaluation or unable to perform the evaluation for the amount approved, due to "the complexity of [the Student]'s profile and history, the amount of specialists' reports and evaluations to read prior to the testing, and his ability to test for only 40 minutes per morning."
P-17-1 and -2.

53. In her September 24, 2012 email, Parent A provided specifics regarding her contacts with potential providers of the evaluation, including (a) that Mindwell Psychology estimated the cost of evaluating the Student at three thousand five hundred dollars ($3,500.00), "but would require a paid consultation to determine the exact amount of work (and rate) required to perform the work as requested on the IEE" and (b) that Stixrud & Associates would conduct the evaluation for three thousand eight hundred and fifty dollars ($3,850.00), would break the testing into seven to ten sessions, was holding spaces for the Student in his schedule, and would begin the testing as soon as the maximum IEE rate was increased. *Id.*

54. The undersigned finds that Parent A's September 24, 2013 email (*Id.*) put Respondent on notice that Parent A wished to have Dr. Stixrud perform the IEE.

55. Based upon all of the record evidence, the undersigned finds that the information Parent A provided to the potential evaluators (other than Dr. Stixrud) regarding the difficulty of testing the Student—in particular, the need to divide his testing into 40-minute sessions once per day over six to seven days—and regarding what she characterized as "separate tests" listed on the IEE authorization letter, motivated those

15

potential evaluators to decline to evaluate the Student, to require a higher fee to evaluate the Student, or to require a fee to meet with or observe the Student to determine whether they could evaluate him.

56. Based upon all of the record evidence, the undersigned finds that the amount initially authorized by Respondent for the comprehensive psychological evaluation of the Student—one thousand two hundred ninety-three dollars and fifty cents ($1,293.50)— was sufficient for Petitioner to find a competent evaluator willing and able to conduct such an evaluation *but for* Parent A's warnings described in the preceding paragraph— warnings that the undersigned finds to have exaggerated the actual difficulty of testing the Student.

57. On October 12, 2012, not having received a reply to her September 24, 2012 email, Parent A re-sent it. P-17-1.

58. Respondent did not respond until after the DPC was filed herein on March 8, 2013. Testimony of Parent A.

Facts Related to Respondent's Resolution Session Offer, Petitioner's Response, and Respondent's Subsequent IEE Authorization Letter

59. At the Resolution Session Meeting, which occurred on April 4, 2013, Dr. Ling tentatively agreed to perform the independent psychological evaluation of the Student for three thousand dollars ($3,000.00) and agreed to conduct the testing over six to seven days at the Student's home. P-7-3, R-3-2.

60. After Parent A stated her view of the Student's testing requirements—that the undersigned finds to have exaggerated the difficulty of testing the Student—Dr. Ling

stated that prior to testing, he wished to observe the Student, and might determine that his fee would be higher or that the Student was "untestable." P-7-3.

61. At the Resolution Session Meeting, Respondent offered to pay three thousand dollars ($3,000.00) for Dr. Ling to evaluate the Student. R-3-2.

62. On April 12, 2013, Petitioner's counsel advised Respondent's counsel that Petitioner was "unable to respond" to Respondent's "claimed offer" because Dr. Ling had not agreed to perform the testing for three thousand dollars ($3,000.00). P-10.

63. On April 23, 2013, Petitioner emailed Dr. Ling and asked him to clarify in writing his position that he would require compensation from Respondent for an initial meeting to determine whether he could test the Student and what his fee would be. P-18.

64. Dr. Ling decided not to pursue evaluating the Student.[9] Testimony of William Ling.

65. On April 24, 2013, Respondent issued a written authorization for an independent psychological evaluation up to three thousand dollars ($3,000.00), allowing Petitioner to select the provider and also allowing for additional funding if justified. R-4. Respondent agreed to pay the provider five hundred dollars ($500.00) for consultation if the provider requested additional funding and Respondent denied that funding. *Id.*

66. Parent A did not receive the April 24, 2013 IEE authorization directly from Respondent. Testimony of Parent A.

---

[9] Petitioner's counsel spent substantial hearing time questioning Dr. Ling about his evolving position on the fee he would require to evaluate the Student, whether he would require an observation prior to deciding whether to evaluate the Student or to request an increased fee, whether he would insist upon payment for that observation, whether his subsequent decision not to evaluate the Student was based upon his being required to appear at the DPH, etc. However, it is not necessary for the undersigned to determine Dr. Ling's motivation to decide the issue in this case.

67. The April 24, 2013 IEE authorization letter was included in Respondent's disclosures filed May 1, 2013 in this proceeding (R-4) and therefore has been available to Petitioner since that day.

68. Dr. Ling, whose practice is one hundred percent (100%) testing, testified that three thousand dollars ($3,000.00) is sufficient to conduct a neuropsychological evaluation, not just a comprehensive psychological evaluation, of the Student. Testimony of William Ling.

69. The undersigned finds that the amount authorized for the Student's comprehensive psychological evaluation in the April 24, 2013 IEE authorization letter— three thousand dollars ($3,000.00)—is more than sufficient for Petitioner to find a qualified independent evaluator other than Dr. Stixrud to conduct such an evaluation of the Student, even considering his needs and limitations; and in fact this amount probably is sufficient for the additional neuropsychological testing and interpretation that Parent A has been seeking (but did not request from Respondent).

## VII. BURDEN OF PROOF

In a special education DPH, the burden of persuasion is on the party seeking relief. DCMR § 5-E3030.3; *Schaffer v. Weast,* 546 U.S. 49 (2005). Through documentary evidence and witness testimony, the party seeking relief must persuade the Impartial Hearing Officer by a preponderance of the evidence. DCMR § 5-E3022.16; *see also, N.G. v. District of Columbia,* 556 F. Supp. 2d 11, 17 n.3 (D.D.C. 2008).

## VIII. CREDIBILITY AND PERSUASIVENESS

The undersigned found all of the witnesses to be credible, to the extent of their first hand knowledge or professional expertise.

Although Parent A used IDEA and medical terminology fluently in her testimony, she was not qualified as an expert in any field of medicine or psychology, or in any aspect of special education. Accordingly, her testimony has been afforded only the weight appropriate to a lay witness. Similarly, although Parent A has a heightened awareness of the Student's limitations, her opinion of what accommodations he would require in the environment of psychological testing was not persuasive in the light of contrary testimony by two psychologists (one of whom testified as a lay witness but still was more persuasive than Parent A on this point in view of his education, experience and emotional detachment from the Student).

## IX. CONCLUSIONS OF LAW

1. The IDEA is intended "(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living [and] (B) to ensure that the rights of children with disabilities and parents of such children are protected…" 20 U.S.C. § 1400(d)(1). *Accord*, DCMR § 5-E3000.1.

2. The parents of a child with a disability have the right to obtain an IEE. 34 C.F.R. § 300.502(a)(1).

3. IEE means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the Student. 34 C.F.R. § 300.502(a)(3)(i).

4. With exceptions not relevant here, the public agency must ensure that the IEE is provided at public expense. 34 C.F.R. § 300.502(b)(2)(ii).

5. Public expense means that the public agency either pays the full cost of the IEE or ensures that the IEE is otherwise provided at no cost to the parent. 34 C.F.R. § 300.502(a)(3).

6. The criteria under which an IEE at public expense is obtained, including the location of the evaluation and the qualifications of the examiner "must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an [IEE]." 34 C.F.R. § 300.502(e)(1).

7. Except for the criteria described in the preceding paragraph, "a public agency may not impose conditions or timelines relating to obtaining an [IEE] at public expense." 34 C.F.R. § 300.502(e)(2).

8. The undersigned concludes that requiring a Parent to use a particular evaluator, or tying a higher fee to the parent's use of a particular evaluator, imposes a condition relating to obtaining an IEE at public expense that is not authorized under 34 C.F.R. § 300.502(e)(1) and therefore is prohibited under 34 C.F.R. § 300.502(e)(2). *See, e.g., Letter to Parker* (P-1-1 and -2).

9. In the instant case, Respondent's April 4, 2013 offer to pay a higher fee if Petitioner agreed to use Dr. Ling for the evaluation (Finding of Fact 61) was made in the context of resolving the instant DPC. Even if Respondent's resolution offer were

analyzed and found wanting under 34 C.F.R. § 300.502, the preference expressed for Dr.

Ling was cured by Respondent's April 24, 2013 IEE authorization letter approving that

same higher fee for an evaluator of Petitioner's choice (Finding of Fact 65). Moreover,

there is no indication in the record that Petitioner sought, or would have sought an

evaluation during that 20-day period. Accordingly, the undersigned finds Respondent's

offer of a higher fee tied to a particular evaluator to be immune from challenge in this

DPC proceeding as an offer of settlement of the same DPC, or in the alternative to be a

*de minimis* procedural violation of 34 C.F.R. § 300.502(e)(2).

   10. The comments published on August 14, 2006, with the final regulations in

34 C.F.R. Parts 300 and 301, elaborate on the acceptable criteria that a public agency

may use when a Parent obtains an IEE at public expense.  Relevant to the instant case, the

U.S. Department of Education cited 34 C.F.R. §§ 300.502(a)(2), (e)(1) and (e)(2) when

reiterating the Department's longstanding position that "public agencies should not be

required to bear the cost of unreasonably expensive IEEs," and that "it is appropriate for a

public agency to establish reasonable cost containment criteria applicable to personnel

used by the agency, as well as to personnel used by parents," provided that the public

agency provides "a parent the opportunity to demonstrate that unique circumstances

justify selection of an evaluator whose fees fall outside the agency's cost containment

criteria." 71 *Federal Register* 1566 (14 August 2006), pp. 46689-46690.

   11. In the instant case, Respondent asserts that it provided the Parent such an

opportunity because the IEE authorization letter contained the following language:

> The maximum rates the District of Columbia will reimburse for the
> assessments authorized by this letter for your student are listed above.
> Reasonable and documented fees that exceed these rates may be allowed
> on a case by case basis at the discretion of the District of Columbia, when

> the evaluator you select can justify that the excess costs were essential for educational and/or diagnostic purposes.

Contrary to Respondent's assertion, the undersigned concludes that the above-quoted language imposed conditions upon Petitioner obtaining the Student's IEE that went beyond what is permissible under 34 C.F.R. § 300.502, because Respondent's language (a) retained "discretion" to approve higher rates, and (b) required the *evaluator selected by Petitioner* to justify the excess costs. Under Respondent's language, as reinforced by Respondent's counsel at the DPH, a Parent must first select an evaluator,[10] and the evaluator must then communicate with Respondent to justify costs in excess of the approved IEE rate. Because a prospective evaluator is unlikely to take on this burden without knowing whether a higher fee will be approved, this language acts as an impediment to a Parent obtaining an IEE.

12. The undersigned concludes that Parent A's emails to Respondent in September and October of 2012 (Findings of Fact 52-54 and 57) satisfied, as a procedural matter, the Parent's obligation with regard to cost containment under 34 C.F.R. § 300.502.

13. The undersigned further concludes that Respondent's failure to respond to Petitioner's September-October 2012 emails (Finding of Fact 57 and 58) constituted a procedural violation of its obligations under IDEA regarding IEEs, specifically the Parent's right "to demonstrate that unique circumstances justify selection of an evaluator

---

[10] Even if this requirement were legally permissible, Parent A's September 24, 2012 email to Respondent identified Dr. Stixrud as the evaluator Petitioner wished to utilize if Respondent would authorize his fee. Finding of Fact 54.

22

whose fees fall outside the agency's cost containment criteria." 71 *Federal Register* 1566 (14 August 2006), pp. 46689-46690.

14. However, the only issue accepted for hearing in the instant case was whether the Student was denied a FAPE, not more broadly whether Respondent violated its obligations under IDEA. HO-8-3.

15. The IDEA requires that all students be provided with a free appropriate public education ("FAPE"). FAPE means:

> special education and related services that –
>
>> (A) have been provided at public expense, under public supervision and direction, and without charge;
>>
>> (B) meet the standards of the State educational agency;
>>
>> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>>
>> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. §1401(9); *see also,* 34 C.F.R. §300.17 and DCMR § 5-E3001.1.

16. A parent may file a DPC over a local educational agency's procedural violations of IDEA. However, a procedural violation does not necessarily equate to a denial of FAPE. Rather, a hearing officer's determination of whether a child received a FAPE must be based on substantive grounds:

> Procedural issues
> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies -
>> (I) impeded the child's right to a free appropriate public education;
>> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>> (III) caused a deprivation of educational benefits.

20 U.S.C. § 1414(f)(3)(E). *See also*, 34 C.F.R. § 300.513(a). *Accord, Lesesne v. District of Columbia*, 447 F.3d 828, 45 IDELR 208 (D.C. Cir. 2006).

17. The undersigned concludes that Respondent's procedural violation (Conclusion of Law 9) did not deny the Student a FAPE because the fee authorized for the psychological IEE in June 2012 was adequate (Finding of Fact 56).

Even if an Impartial Hearing Officer retains authority to order a local educational agency to comply with procedural requirements (*see,* 20 U.S.C. § 1414(f)(3)(E)(iii)), the subsequent IEE authorization letter that Petitioner received on May 1, 2013 is more than sufficient for the Student's comprehensive psychological evaluation (Finding of Fact 69), curing the procedural violation.[11]

Summary

The amount authorized by Respondent for the psychological evaluation of the Student orally on June 8, 2012, and confirmed in the IEE authorization letter on June 12, 2012 was adequate; accordingly, Respondent did not deny the Student a free appropriate public education ("FAPE") by providing Petitioner an authorization to obtain an independent psychological assessment at public expense on June 8, 2012, that provided insufficient payment for the assessment to allow Petitioner to find an evaluator willing to conduct the assessment.

_____

[11] To avoid future violations that might result in denials of FAPE, Respondent's management and counsel would be well advised to revise the IEE authorization letter language to comply with 34 C.F.R. § 300.502. However, the undersigned lacks authority to order such action by Respondent. The undersigned also notes that failure to respond to a parent's emails or other communications about special education concerns—even when not violating a law or regulation—may cause or increase a parent's level of frustration and thereby interfere with the cooperation between parent and local educational agency that is in the best interest of the child.

## X. ORDER

Based upon the above Findings of Fact and Conclusions of Law, it is hereby

ORDERED:

Petitioner's DPC dated March 8, 2013, is *dismissed* in its entirety, with prejudice.

Dated this 16th day of May, 2013.

_____

Charles Carron
Impartial Hearing Officer

## NOTICE OF APPEAL RIGHTS

The decision issued by the Impartial Hearing Officer is final, except that any party aggrieved by the findings and decision of the Impartial Hearing Officer shall have 90 days from the date of the decision of the Impartial Hearing Officer to file a civil action with respect to the issues presented at the due process hearing in a district court of the United States or a District of Columbia court of competent jurisdiction, as provided in 20 U.S.C. § 1415(i)(2).